# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

GREGORY SESSION,

     Plaintiff,

v.

                               Case No. 3:23-cv-170-TJC-PDB

H.D. GATOR DELOACH, in his
official capacity as Sheriff, Putnam
County, Florida,

     Defendant.

_____

## O R D E R

**THIS CASE** is before the Court on Defendant's Dispositive Motion for

Summary Judgment, which has been fully briefed. Docs. 76, 85, and 90. Plaintiff

Gregory Session has sued his former employer, Sheriff "Gator" DeLoach,

alleging his termination was improper and violated various statutes prohibiting

race discrimination, disability discrimination, and his rights to leave.[1]

---

[1] The operative complaint has seven remaining claims. Doc. 7. Counts I,
III, and V allege race discrimination under Title VII, 42 U.S.C. § 1981, and the
Florida Civil Rights Act, respectively. Count VII is for disability discrimination
(failure to accommodate) under the Americans with Disabilities Act and is
limited to Session's heart condition. Doc. 37. Count VIII is for ADA retaliation.
Count IX is for Family and Medical Leave Act interference. Count X is for FMLA
retaliation. Counts II, IV, and VI, for retaliation, have been dismissed. Doc. 37.
Count XI, alleging workers compensation retaliation, was severed and
remanded. Doc. 19. Session's opposition to summary judgment claims he was
not paid from October 12, 2021, through November 8, 2021 (involving pay for
time worked and administrative leave), but he has not made a separate claim

I.     **BACKGROUND**[2]

 A. <u>Employment Overview</u>

 Session, who is Black, worked in corrections for the Sheriff from 1986, until his retirement in 2011.[3] Doc. 75-1 at 17–18, 31. His last position was lieutenant. <u>Id.</u> at 17. The Sheriff rehired Session in March 2013, and terminated Session in November 2021. Doc. 75-1 at 64. In his second employment term, Session was always a corrections deputy. <u>See</u> Doc. 75-1 at 17.

 B. <u>Prior Discipline and Probation (May-June 2021)</u>

 In May 2021, a kitchen employee complained Session engaged in bullying and threatening behavior. <u>See</u> Doc. 75-1 at 262–69. Session claimed the incident was made up and that he was confused with another Black officer who admitted to bullying. Doc. 75-1 at 82–84. Even so, Session testified that someone in the kitchen was "badgering" him and his response included cussing. Doc. 75-1 at

---

for the unpaid time nor argued how this supports any remaining claim. <u>Compare</u> Doc. 85 at 15–16 <u>with</u> Doc. 7.

 [2] To oppose summary judgment, Session submitted l76 exhibits, totaling almost 5,000 pages. The Sheriff has challenged much of the evidence and the parties have agreed to exclude some items, but the Sheriff continues to dispute others. <u>See</u> Doc. 93. These disputed items include all remaining exhibits that are part of Docs. 82 and 83, except Docs. 83-32 and 83-33, the jail audit report and related documentation. However, for purposes of the motion for summary judgment, the Court has considered all of Plaintiff's evidence.

 [3] The Court generally refers to the Defendant as Sheriff, because he has been sued in his official capacity. DeLoach became sheriff in 2017, but he was not sheriff when Session was rehired.

93–94. John Zagar investigated, including interviews with six witnesses and Session. Doc. 75-1 at 262–68. The investigation sustained the alleged violations. Doc. 75-1 at 269. Session was disciplined in June 2021, including twelve months of probation. Id. Session appealed the discipline but there was no change. Docs. 80-29, 80-33.

C. Miscount Incident, Investigation, and Termination (September-November 2021)

The jail regularly conducts inmate counts, including counts every six hours. If the initial count is incorrect ("does not clear"), there is a recount. See Doc. 75-1 at 107–08, 131. If the recount is incorrect, then a master count is done. See id. at 98, 110. A master count involves full lockdown, and a physical count of inmates comparing armbands to a roster list. Id. at 98. If the master count is incorrect the jail will report a missing inmate. Id. at 112–13.

On September 14, 2021, Session, Terrance Haynes, and Isaiah Decent were on duty together. Session and Haynes are Black, while Decent is mixed race and light skinned. Id. at 48, 103; Doc. 82-29 at 67. On this day, Decent did both the count and recount incorrectly. Doc. 75-1 at 36, 102, 107–09. Session did the master count and it cleared. Id. at 110.

Lieutenant Steven Breckenridge, white, was also on duty that day. See Doc. 75-1 at 78. Because of recurring problems with inmate counts, Breckenridge decided to review video. His review identified problems with the

3

count and recount and multiple other policy violations by all three officers. Id. The same day, Breckenridge requested all three officers be investigated.[4] Id.

On October 15, 2021, Session made a written complaint about a "total hostile working environment" and "being scrutinized." Doc. 80-37. The complaint does not mention race and does not provide any examples of a hostile work environment or how he was scrutinized.[5] Later that day, Session was notified of the investigation into the miscount and other issues.[6] Doc. 81-2 ¶¶ 42, 44; Doc. 75-1 at 272.

Zagar did three investigations, one for each officer. Docs. 80-7, 82-2; see Doc. 80-71. For Session, the investigation addressed twelve alleged violations that Session, Decent, and Haynes "knowingly neglected their duties regarding searching inmates, allowing inmates to travel within the jail without supervision and failing to accurately perform mandatory head counts." Doc. 80-7. Zagar reviewed video and interviewed Haynes and Decent. Id. Zagar tried to interview Session twice, but Session was out of work both days due to an injury.

---

[4] Breckenridge's request was addressed to Captain Clayton Silva and approved by Colonel Joseph Wells. See Doc. 75-1 at 115, 270, 273.

[5] Per Session, Breckenridge assigned himself to cover staff shortages on Session's shift to target Session. Doc. 75-1 at 37.

[6] A memo to Session on October 20, 2021, stated his complaint was "received immediately following" the notice that he was the subject of an administrative investigation, and the complaint would therefore be part of the investigation file. Doc. 80-38.

Doc. 75-1 at 138–39. Zagar also interviewed Lieutenant Kathy Yoder "who explained proper jail policy and procedures and identified violations in the [] videos." Doc. 80-7 at 4. Zagar's investigation report was issued October 27, 2021, and sustained all the alleged violations. Id.

The Sheriff has final authority for discipline, but discipline recommendations are reviewed by multiple levels and are separate from the investigation. See Doc. 75-16 at 41; Doc. 80-37. For Session, termination was recommended and approved by all supervisory levels on October 27, 2021, with the Sheriff's approval on October 28, 2021. Doc. 80-39. The Sheriff notified Session his employment was terminated and of his right to a name clearing hearing the same day he approved the termination.[7] Doc. 80-8; see Doc. 75-15 at 22. The next to last approval was from Colonel Joseph Wells, who recommended termination because Session was already on probation.[8] Doc. 75-15 at 62–63; Doc. 80-39.

---

[7] Alleged violations were also sustained for Decent and Haynes. Doc. 82-3; see Doc. 80-71. Decent had no disciplinary history and Haynes had not been disciplined since being reemployed in 2018. For Decent, the Sheriff decreased the recommended discipline to a written reprimand, 12-hour suspension (down from 24 hours), and one year of probation. Doc. 80-71. For Haynes, the Sheriff increased the recommended discipline to termination (instead of written reprimand, 36-hour suspension, and one year probation). Doc. 82-10. Haynes has also sued alleging his termination was discriminatory. See Haynes v. DeLoach, 3:22-cv-1104 TJC-MCR. And the Court denied summary judgment in his case. Doc. 40.

[8] Wells was deposed twice. Doc. 75-15 is the August 14, 2023, deposition and Doc. 80-80 is the May 16, 2025, deposition. Wells' 2025 testimony did not

Session requested a name clearing hearing and his status was changed to administrative leave. <u>See</u> Doc. 75 at 53, Doc. 80-9. The name clearing was held on November 16, 2021. <u>See</u> Doc. 80-9. At the name clearing, Session was represented by an attorney and was able to participate.[9] Doc. 75-1 at 63–64. 142. Session was notified the same day that the termination was upheld. Doc. 75-1 at 285.

D. <u>Other Miscounts or Violations</u>

Session alleged other miscounts involving white officers have not resulted in termination. Doc. 75-1 at 43, 270. Corporal Kendra Bush, Black, observed an incorrect count as part of a shift change on October 29, 2021.[10] Doc. 82-36 at 38-42. After the count did not clear, all officers were directed to recount, but she observed two white deputies, Michael Walker and Trevor Bishop, did not recount. <u>Id.</u> The recount was correct, so a master count was not needed. <u>Id.</u>; <u>see</u> Doc. 75-1 at 75. Bush reported the failure to recount to Lieutenant Johnson, who reviewed video and confirmed they did not recount.[11] Doc. 82-36 at 41–42.

---

recall the probation until refreshed, but Wells testified probation would always be a factor in discipline recommendations. <u>See</u> Doc. 80-80 at 17–21, 70, 98–107.

[9] Session claims his name clearing hearing "was grossly unfair and did not give [Session] a meaningful opportunity to explain all the issues." Doc. 85 at 11. Session fails to offer details or evidence about why the hearing was unfair, even though he was represented by counsel. <u>See</u> Doc. 85 at 11.

[10] Bush was later terminated and has her own lawsuit challenging the termination. <u>Bush v. DeLoach</u>, 3:23-cv-253 TJC-LLL.

[11] Johnson and Breckenridge testified they were not aware of the alleged

No investigation was done, and there was no discipline, much less termination. Doc. 75-1 at 71–74.

Session argued he should not be held responsible for count errors when he was not involved in the incorrect count or recount done by Decent. Other officers testified they were not aware of any discipline for an officer not directly involved in a miscount. See e.g., Doc. 82-36 at 37–38. Session alleged white officers were not terminated for more serious misconduct. Doc. 85 at 13–15.

E. Other Information

Session alleged the investigation and his termination were racially motivated, but he does not have direct evidence. See Doc. 75-1 at 33–60. Session believed Wells influenced the investigation outcome, "forc[ing Zagar] to make sure" the allegations were sustained because Session was Black and because Zagar reported to Wells. See Doc. 75-1 at 124–25. Session thinks Breckenridge is racist and used his supervisory authority to target Haynes and Session.[12] See Doc. 75-1 at 37–38, 80–81. Session did not hear racial remarks from

_____

count issue with Walker and Bishop. Doc. 75-17 at 5; Doc. 75-14 at 21. Walker and Bishop worked a different rotation than Session. Doc. 75-1 at 73.

[12] Per Session, Breckenridge targeted Haynes and Session, but disliked Haynes more. Doc. 75-1 at 37, 46. Session testified Silva did not like Session because he is Black, but Session did not hear Silva make any race remarks, and did not argue Silva was responsible for the termination decision. Doc. 75-1 at 53-57. Session also testified Silva wanted him gone because of Session's prior leadership and management roles. Id.

Breckenridge. Doc. 75-1 at 37. Session alleged minority employees were routinely overlooked for promotion and advancement, and white officers were not disciplined in the same way. Doc. 75-1 at 35, 44. Even so, Session testified at least one white officer, Lieutenant Hamby, retired because he felt targeted and believed the current administration did not want officers with experience. See Doc. 75-1 at 81.

Session filed his EEOC charge on March 28, 2022. Doc. 75-11. Session checked boxes on the form to indicate race and disability discrimination.[13] Id. The charge stated the earliest discrimination was October 2021 and that he "had been an employee in good standing with no discipline . . . ." Id.

F. 2024 Jail Audit

In 2024, the Sheriff requested an audit of the jail, with results released in September 2024. Doc. 83-32; see Docs. 80-43, 80-44, 80-45, and 80-46. The audit report is almost seventy pages, summarizes over twenty interviews, and documents multiple leadership concerns and instances of poor management. Doc. 83-32.

The audit report does not mention race remarks or race discrimination, except to acknowledge Breckenridge is mentioned in two discrimination lawsuits. Id. at 56. One deputy interviewed thought discipline was inconsistent

---

[13] Session checked the retaliation box but has dropped his race retaliation claims.

for himself and someone else, but race and other details were not identified. <u>See</u> <u>id.</u> at 21. Comments about Breckenridge in the report included that he was "rude," "abrasive," "made demeaning comments to women," "talked down to subordinates," and was counseled for using "colorful" language. <u>Id.</u> at 19, 24, 31, 37, 42, 55.

The audit conclusion specifically addressed three individuals: Major Scott Surrency, Captain Ryan Dunn, and Breckenridge. For Breckenridge, it stated he "potentially created a hostile work environment by publicly demeaning subordinates with offensive language demonstrating a lack of professionalism," has "made sexist jokes towards members," it was common for Breckenridge to "berate members," and "his behavior towards staff and subordinates is likely to severely affect the discipline, good order, or reputation of the agency." <u>Id.</u> at 67.

G. <u>FMLA and ADA</u>

On October 7, 2021, Session sent Wells a memo requesting Family and Medical Leave Act time off "for medical treatment and possible surgery." Doc. 80-11. The memo stated Session was unsure how much leave would be needed, but he would complete FMLA paperwork after seeing a specialist. <u>Id.</u> The memo did not include other details about his condition. <u>See</u> <u>id.</u>

Session submitted the FMLA request on or shortly after October 20, 2021 (when it was signed by the treatment provider). Doc. 80-12. The FMLA request stated Session had a history of "CAD" (coronary artery disease) and was

experiencing chest pain. Doc. 80-12. The request indicated Session could not work from October 27 to 30, 2021, and would have a follow up appointment on November 3, 2021. Id. Future incapacity would "be based on findings from [the] coronary angiogram and [Session's] reaction to appropriate medical therapy." Id. On October 25, 2021, Tammy McEnroe, Human Resource Manager, approved FMLA leave for October 27 through November 3, 2021. Doc. 75-1 at 291.

Session claimed his heart condition was a disability that impacted his ability to work and sleep. Doc. 75-1 at 31–32; Doc. 81-2 ¶ 54. Apart from his FMLA request, Session did not request an accommodation based on the heart condition. See Doc. 75-1 at 32.

The parties dispute who was aware of the FMLA request. Session alleged everyone in his chain of command was aware of his FMLA request or "should have known" based on providing staffing coverage, but he did not talk to any of the administrators about his FMLA request. Doc. 75-1 at 146–54. Session alleged Wells knew of the request because the FMLA memo was addressed to Wells, even though Session did not give it to Wells. Id. at 146–48. Wells testified FMLA paperwork comes through McEnroe and him, and that the Sheriff was

10

not involved with FMLA paperwork and not necessarily aware of the FMLA request.[14] Doc. 75-15 at 75.

No medical issues were raised in the investigation or at the name clearing hearing. Doc. 75-1 at 64. Breckenridge's request for the investigation was not related to medical issues. See Doc. 75-1 at 47, 115–16. Even so, Session alleged his termination is related to FMLA because administrators were angry about the need to provide staff coverage for the time off. See Doc. 75-1 at 158–59.

## II.    ANALYSIS

### A. Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Further, the Court has construed evidence in the light most favorable to Session. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014).

### B. Race Discrimination Claims

Session can establish race discrimination claims by either the McDonnell

---

[14] The record was not clear if Wells knew about the FMLA request before or after the investigation was authorized. The memo addressed to Wells was before the investigation, but the FMLA request was completed after the investigation had started.

Douglas burden shifting paradigm[15] or through a convincing mosaic of evidence sufficient for a jury to infer discrimination. Ismael v. Roundtree, 2025 WL 3492930 at *4–5, __ F.4th __ (11th Cir. 2025). Session argued he has done both.

    a. McDonnell Douglas Burden Shifting Paradigm

Under McDonnell Douglas, a prima facie case of race discrimination requires Session to show: he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated individual outside his protected class. Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).[16]

The parties dispute the fourth element, which requires an alleged comparator be "similarly situated in all material respects." Lewis v. City of Union City, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc); see also Jimenez v. U.S. Att'y Gen., 146 F.4th 972, 996 (11th Cir. 2025). A similarly situated comparator will ordinarily have (1) engaged in the same behavior; (2) been

---

[15] "If the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action. If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006) (internal citation omitted).

[16] Section 1981 and FCRA race discrimination claims are analyzed using Title VII's framework. Poer v. Jefferson Cnty. Comm'n, 100 F.4th 1325, 1336 (11th Cir. 2024) (§ 1981 claims); Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1325 (11th Cir. 2020) (applying Title VII analysis to FCRA).

subject to the same employment policy, guideline, or rule; (3) had the same supervisor; and (4) shared a similar employment or disciplinary history. <u>Lewis</u>, 918 F.3d at 1227-28. Session argued there are three comparators of a different race who were treated more favorably because they were involved in miscounts but not terminated: Decent, Walker, and Bishop.[17]

The Court's analysis starts with Decent, who was involved in the same incident as Session. There was a basic difference between Decent and Session at the time of the incident: Decent had no prior discipline and Session was on probation. Session argued the prior discipline itself was problematic and should be discredited. This fails for two reasons. One, Session failed to exhaust administrative remedies for the prior discipline. His EEOC charge indicated the earliest discrimination was October 2021 (months after he was placed on probation) and his EEOC charge specifically denied any prior discipline. Doc. 75-11. Accordingly, the EEOC investigation would not reasonably include prior discipline when the charge denied any prior discipline. <u>See</u> <u>Batson v. Salvation Army</u>, 897 F.3d 1320, 1327–28 (11th Cir. 2018) (citing <u>Gregory v. Ga. Dep't of</u>

---

[17] Session identified Kelsie Collier as a comparator. Doc. 85 at 12, 22. Collier, white, testified about being involved in multiple issues with counts after the new jail opened and several master counts thereafter. Doc. 80-81 at 8-10. None of these count issues resulted in termination. <u>Id.</u> Collier's testimony established that miscounts occurred, but it lacks detail to establish Collier was similarly situated. Miscounts after the new facility opened involved a different circumstance and time frame. Collier's testimony about other master counts does not provide details about the error, time frames, or basis of his knowledge.

Hum. Res., 355 F.3d 1277, 1279–80 (11th Cir. 2004)) (noting judicial claims are limited by the scope of the underlying administrative charge and the proper inquiry is whether the plaintiff's complaint is like or related to, or grew out of, the allegations contained in the EEOC charge.). Two, the prior discipline was a discrete act, which should have been separately challenged, and is not part of a continuing violation. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115–16 (2002). Given the difference in disciplinary history, Decent is not a similarly situated comparator.

As for Walker and Bishop, Bush reported a recount was ordered, but they did not recount. Even so, the recount cleared and a master count was not needed. Despite Bush's report, there was no investigation and no discipline. This, however, involved a different supervisor (Johnson not Breckenridge), Considering there was a different supervisor and no master count, Bishop and Walker are not similarly situated. Jimenez, 146 F.4th at 996.

Nor has Session shown the disciplinary histories for Walker and Bishop are like his own. There was no argument Walker or Bush were on probation, much less evidence of any prior discipline. Moreover, for Session, twelve violations were sustained, and the violations were not limited to the incorrect count and recount. The other sustained violations included improper security measures with inmates. There was no allegation of similar violations by Walker and Bishop. See Jimenez, 146 F.4th at 997 (quoting Lewis, 918 F.3d at 1228)

14

("An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—e.g., who engaged in different conduct . . . or who have different work histories.").

Session has not provided a prima facie case, because he has not established a similarly situated comparator outside his protected class was treated more favorably. No alleged comparator was already on probation, working under Breckenridge, and involved with both miscounts and other policy violations.

The arguments about pretext are like the arguments about a similarly situated comparator and fail for similar reasons. Even if Decent, Walker, or Bishop were considered comparators, Session must rebut the reason for his termination by showing it was implausible and not worthy of credence. Session was terminated after he was on probation and multiple other violations were sustained. Terminating an employee on probation for misconduct due to additional misconduct is a legitimate business decision. The Sheriff was the ultimate decision-maker, and Session has not provided evidence that would allow a reasonable factfinder to conclude relying on Session's probationary status was a cover for race discrimination.

### b. Convincing Mosaic Analysis

Session argued he has established a convincing mosaic of evidence, sufficient to defeat summary judgment. Ismael, 2025 WL 3492930 at *6 (noting

evidence for pretext is a subset of evidence that may be considered for a convincing mosaic).

In Jenkins v. Nell, the Eleventh Circuit reversed summary judgment and remanded the case, finding the plaintiff presented sufficient evidence to support intentional race discrimination. 26 F. 4th 1243, 1250-51 (11th Cir. 2022). For the Jenkins plaintiff, circumstantial evidence included: (1) a comparator, not of the same protected category, who committed the same violation but remained employed; (2) at least 18 employees of the same race as plaintiff who "resigned, or transferred from the department" after the defendant became manager; (3) evidence the defendant mistreated three employees of the same race and position as plaintiff; (4) defendant's claimed relationship with HR; (5) defendant's racially-biased comments about employees; and (6) the defendant's shifting reasons for terminating plaintiff. Id.

Session argued his case is like Jenkins and offers multiple arguments to discredit his termination. These include: (1) his probationary status was not part of why he was terminated, (2) he should not have been on probation, (3) he should not have been disciplined for the incorrect count and recount by Decent, (4) termination was too severe for a Level Three violation, (5) discipline was inconsistent, (6) the investigation was flawed, and (7) there was racial bias. Session's ultimate burden is to provide enough evidence to allow a fact finder to conclude his termination was motivated by intentional race discrimination.

16

### 1. *Probation Status Did Not Matter for Termination*

First, Session argued there is a fact dispute whether his probation status mattered to the termination decision because probation was not specifically mentioned in the disciplinary recommendation or termination letter.[18] <u>See</u> Doc. 85 at 21. Even though the disciplinary recommendation does not mention probation, it does reference "prior disciplinary action." In 2023, Wells testified he recommended termination because Session was on probation. Wells was deposed again, in 2025, almost four years after Session was terminated. In the second deposition, Wells initially testified he did not recall Session's prior discipline, but did recall the probation after being shown the disciplinary worksheet referenced in the recommendation. <u>See</u> Doc. 80-80 at 18, 70, 98–107; Doc. 80-39. In the 2025 deposition, Wells testified probation would always be a factor in discipline recommendations. <u>Id</u>.[19]

Session argued Well's lack of initial recall during the second deposition is enough to allow "a reasonable juror to decide that the probation argument is an argument [the Sheriff] created after-the-fact." Doc. 85 at 21. The Court disagrees. There is no dispute Session was on probation, and the probation had

---

[18] Discipline recommendations are separate from the investigation. Therefore, the investigation does not mention prior discipline.

[19] Curiously, the Sheriff was not deposed in this case, nor did he provide an affidavit to discuss his reasons for Session's termination.

started a few months before the miscount incident. Wells' second deposition clarified that a discipline worksheet would be attached to the discipline recommendation and Wells testified probation would always be part of the decision. The reference to prior discipline and attachment of the discipline worksheet overcomes Session's argument that probation was not considered because it was not specifically referenced.

## 2. *Should Not Have Been on Probation*

Next, Session argued he should not have been on probation. As discussed supra, Session failed to exhaust administrative remedies regarding the prior discipline, and it was not part of a continuing violation. Although it can be considered as evidence, even if not a separate claim, that does not help Session. Cf. Ismael 2025 WL 3492930 at *8. The Courts "do not sit as a super-personnel department, and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." Jimenez, 146 F.4th at 997 (internal quotations omitted). Session disputes the investigation findings, but admits he was being badgered by someone in the kitchen and his response included cussing. Notably, the bullying complaint came from a kitchen employee, not any administrator that Session accuses of racial bias. The prior discipline for Session is supported by the investigation. The Court declines to further assess the investigation or its consequences.

### 3. *Not Responsible for Decent's Errors*

Session next argued he should not be held responsible for Decent's errors with the count. While the perspective is understandable, it is another effort to substitute his business judgment for that of his employer. Although two officers were not required for a count, it was common for the count to be done by two officers with a third officer in the control room. <u>See e.g.</u>, 82-20 at 6. Breckenridge testified the "three individuals assigned to that tower [were] equally responsible for everything that happened in that tower."[20] Doc. 75-14 at 39. The conclusion that Session was also responsible is not dependent on Breckenridge's opinion. The investigation sustained the violations, all five levels of the discipline recommendation and review agreed to termination, and termination was sustained after the name clearing hearing. Doc. 80-7; Doc. 80-39; Doc. 82-21 at 27–28. In other words, each step of the review agreed Session had some level of responsibility for the incorrect count and recount.

---

[20] Breckenridge's testimony reflects that all three officers were responsible and Session, as the senior officer of the three, was "in charge of that tower." Doc. 75-14 at 29, 36, 41. Even though the control room operator cannot do cell checks, Breckenridge explained the person in control tower was responsible to let the counting officer(s) in and out and would know if that was not happening, as in the case with Decent. <u>See</u> Doc. 75-14 at 33, 38. Session sees it differently. He argued he was not in control room because he was either in the cell block or otherwise unavailable, he was not ordered to do a recount, and therefore not responsible. Doc. 75-1 at 132–33, 136.

#### 4. *Termination Too Severe for Level Three Violation*

Session argued Level Three violations, even if properly sustained, should not result in termination until a third occurrence. See Doc. 85 at 10; *see* Doc. 75-16 at 37-40. The Disciplinary Action policy provides the Sheriff discretion to deviate from policy guidelines and provides that multiple violations of the same level are to "be treated as separate violations" with discipline "imposed separately for each violation." Doc. 82-17 at 5, 30–31. The Sheriff testified "[t]hese policies are mine and I have the sole discretion, as sheriff, to deviate from them, including the disciplinary action policy . . . ." Doc. 75-16 at 41. Twelve violations were sustained. Under the policy, three violations support dismissal. See Doc. 82-17.

#### 5. *Inconsistent Discipline*

Session offered multiple examples and types of inconsistent discipline. Doc. 85 at 11-14. One, he was disciplined for violations that did not typically result in investigations or discipline, including miscounts and the inmate security violations. Two, he argued discipline was generally inconsistent and cited violations he thinks were more serious, but did not result in termination.

Multiple officers testified miscounts were common, or at least common on some shifts. Doc. 82-31 at 10-19; Doc. 82-32 at 11-16; Doc. 82-36 at 23–25; Doc. 82-38 at 19. Even though miscounts were common, Zagar, the Sheriff, and

20

others, testified they were not aware of other investigations into similar issues. Doc. 75-16 at 7; Doc. 82-21 at 19; Doc. 82-18 at 26.

Multiple officers testified inmates were not always handcuffed before being removed from their cells. See e.g., Doc. 82-38 at 12-13. For example, Christopher Wood, testified he "made sure" to always follow the policy, but he saw other officers who did not, and he was not aware of anyone ever disciplined. Doc. 82-32 at 13-14. Bush observed violations "all the time." Doc. 82-36 at 26. Apart from evidence that violations were observed, there was no evidence to assess the circumstances, timing, and whether the violations were reported. For example, Bush stated:[21]

Q. But I want to talk about the inmates. I want to go back to this. This is -- two is a violation. "All inmates will be searched when entering or exiting any housing area." Did you see that routinely? Was that something that routinely happened within the Putnam County Sheriff's Office?

A. . . . You're supposed to -- well, all inmates you're supposed to pat them

---

[21] Bush's statement also included the following:

Q. . . . Breckenridge tried to get shifts in trouble for counting as well, going through the doors. So he stayed in the cameras. And that was one of the reasons why I believe they had that meeting, because he was trying to get officers in trouble with the cameras all the time.

Q. And it worked with Session and with Haynes?

A. Yes.

Q. But it didn't with others?

A. No. Because it was like -- when you're talking about getting officers in trouble for counting, of course there's more than one officer and there was more than one shift.

Doc. 82-36 at 29–30.

down, but they didn't always do that.

Q. Okay.

A. They didn't always –

Q. So Breckenridge would have known that that rule was not being enforced?

A. He knew it, because that shift was one of the main ones not doing it. His shift was one of the main ones not doing a lot of stuff. But he wasn't focused on his shift. He was always focused on our shift.

Doc. 82-36 at 30-31.

Session's argument about serious misconduct by others also has problems. Session claimed Bishop "choked an inmate without serious repercussions." Doc. 85 at 14. The cited testimony is from Major Johnny Greenwood who testified he did not know if there had been an investigation and did not know if Bishop had ever been referred for anger management. Compare 85 at 14 with Doc. 80-79 at 16, 18–19. Session argued Deputy Gaither should not have been hired and "engaged in serious misconduct." Doc. 85 at 14. Even if the hiring process could be considered relevant to discipline, the cited testimony of Greenwood is that he was not involved in the hiring and did not have knowledge. Compare 85 at 14 with Doc. 80-79 at 13–16. The other cited source is Gaither's deposition. Doc. 85 at 14. Gaither testified he was disciplined for losing a set of keys and an argument with a coworker. Doc. 80-77 at 12–24. Gaither denied being disciplined for use of excessive force and denied using excessive force. Id. Gaither's discipline for the coworker argument, a single Level Two violation, included a written reprimand, twenty-four hours of unpaid

suspension, anger management classes, and one year of disciplinary probation.
Doc. 81-5: Doc. 80-77 at 12– 6; Doc. 85 at 14.

The examples of inconsistent discipline provide little help to establish
intentional race discrimination. Much of the evidence lacked enough
information for a legally relevant comparison. The evidence largely lacked
information about time frames, circumstances, whether violations were
reported, responsible supervisor, etc. Session, along with Haynes and Decent,
was disciplined for more than ten sustained violations captured on video.
Anecdotal reports of similar violations, occurring one at a time, are too different
to allow a conclusion that differences in discipline were due to race.

### 6. *Flawed Investigation*

Session argued the inconsistent discipline was also a problem with the
investigation because the "alleged infractions Zagar found were common in the
jail by other officers, too, but no one else was investigated or fired." Doc. 85 at
10. He also tried to discredit the investigation because Zagar did not interview
him.

Zagar testified the scope of the investigation was the alleged violations
and not whether such violations were common. Doc. 82-21 at 30–31. Zagar tried
to interview Session on two separate days and both days Session did not report
to work. Zagar's findings were largely based on video review, with input from
Yoder about proper procedure and the violations she observed. Apart from

interviews with Decent and Haynes, there were no investigative interviews. See
Doc. 80-7. Although Session believed the investigation outcome was controlled
by Wells, he does not offer any evidence of this other than his own belief.

The name clearing hearing, where Session was represented by counsel,
provided Session an opportunity to address investigation deficiencies. [22]
Although Session has claimed his name clearing hearing "was grossly unfair"
he has not offered evidence to support this, and the record shows he was
represented by counsel at the hearing. In short, there was no evidence to
support the claim the name clearing hearing was deficient.

### 7. Racial Bias

Session argued the jail was "a hostile work environment littered with
discrimination and racial epithets." Doc. 85 at 25. Most evidence of racial bias
involved Breckenridge, so the Court starts there. Although Session did not hear
racial remarks from Breckenridge, others did. Brittany Foster testified that, in
2021, Breckenridge said he should make her "Black ass come to work."[23] Doc.
80-76 at 8. Kelsie Collier testified she heard heard Breckenridge use the N-word
in 2016, but did not hear that again after Surrency became responsible for the

---

[22] Session argued the hearing was unfair but not does not provide any
examples of unfairness. Doc. 85 at 11.

[23] She did not report the incident and testified she heard Breckenridge
make sexist comments. Doc. 80-76 at 7–8.

jail in 2018.[24]  Doc. 80-81 at 12, 16, 31. Other evidence is general.[25]  One officer,

Allen Norton, stated[26] "Breckenridge would undermine certain employees of

different color," and explained:

> A. He would go -- so he would go behind any kind of decision
> that they would make or any of the sorts that would be about the
> day-to-day basis with our daily duties and get whatever he wanted
> done.
>
> Q. Okay. Meaning, that if they were doing something, would
> he undo that and assign them to do?
>
> A. He would undo that and then have them go do what he
> wanted done and how he wanted it done.

Doc. 82-31 at 9-10. Charles Word testified Breckenridge had a disrespectful

mouth and used the word "boy." Doc. 80-88 at 14.

---

[24] Collier recalled the usage was towards inmates but testified inconsistently about other instances. Compare Doc. 80-81 at 51 (did not use the N-word when he said Session or others were whiny) with Doc. 80-81 at 16 (used it more talking within officers).

[25] Archavette Word, stated she heard Breckenridge make racial remarks, but could not recall any details. Doc. 80-87 at 12:

Q. Okay. Did you ever hear [Breckenridge] make any racial comments or statements to African American inmates?

A. Yes.

Q. Okay. What did you hear?

A. I can't recall exactly what, but whatever came to his mind, he said. There was no filter.

Q. Okay. Were you concerned that he was -- that he was racist?

A. He had some -- there was some red flags.

[26] Norton did not recall Breckenridge making racial slurs, but he heard of instances from others. Doc. 82-31 at 7–8.

Session argued "numerous" Black employees suffered discrimination while also stating the Sheriff employed "[v]ery few black officers." Doc. 85 at 13 (compare section heading and first sentence). As an example, Session claims the only black officers at sergeant position or above (Samaad and himself) were both terminated. To support this, Session cited the deposition of Captain Clayton Silva, who testified he did not know what happened with Green. Session thought Silva did not like him because of his race. Doc. 85 at 13–15.

### 8. *Enough?*

To defeat summary judgment through a convincing mosaic of evidence, Session must provide enough evidence for a factfinder to conclude his termination was due to intentional race discrimination. Session has presented some evidence that Breckenridge made racist comments, but only one specific incident in the three years before Session's termination. Session expressed his belief that others were racially biased, like Silva, but no evidence apart from his own belief. Even if Breckenridge was biased, his role was limited to requesting the investigation, not just for Session, but also Decent. Breckenridge did not participate in the investigation (handled by Zagar) or decide to terminate Session—that was the Sheriff. Breckenridge was not involved in the discipline recommendation for Decent or the decision to not dismiss Decent—that was the Sheriff.

26

Session provided ample evidence to conclude there was poor leadership and probably inconsistent discipline. Even so, Session's own testimony is that there were also other motivations, because the Sheriff "didn't want people that had been there with all the experience." Doc. 75-1 at 81. Per Session, at least one white officer, Hamby, resigned because he felt targeted. Id.

To dispute his discipline, Session argued he should not be responsible or that similar errors were common but not addressed. Evidence about who should be responsible or how to discipline is normally left to the wisdom of the employer, even if the employer makes unwise decisions. Here, while Session was on disciplinary probation he was involved in multiple violations (not just sharing responsibility for Decent's errors) captured on video that resulted in his termination. The alleged comparators are either too different or the information is too general to conclude the termination was due to race.

Session argued he is like the plaintiff in Jenkins, who established a convincing mosaic of evidence, sufficient to defeat summary judgment. In Jenkins the evidence of racial bias and differing treatment focused on a single manager, who was the defendant. There were multiple examples about race remarks and specific examples of different treatment for white employees contrasted with treatment of Black employees, along with general evidence. Here, there is insufficient evidence to create an issue of fact that Session's termination was due to race discrimination. Even if Breckenridge's

27

investigation request was because of Breckenridge's racial bias, Breckenridge did not conduct the investigation, sustain the violations, or decide to terminate Session. Session lacks evidence the Sheriff's termination decision was due to intentional race bias.

Session's other complaints generally concern poor management. The 2024 jail audit documented multiple problems, including poor leadership and resulted in several terminations (including Breckenridge). Much of Session's evidence is from the audit and concerns sex harassment or sex discrimination. Evidence of sex harassment or sex discrimination does not help Session prove race discrimination.[27] Evidence of generally poor leadership, including from Breckenridge and others, is not enough for Session to prove his termination by the Sheriff was due to race discrimination. Cf. Bailey v. Fulton Cnty. Sch. Dist., No. 24-13013, 2025 WL 3642317 at *4 (11th Cir. Dec. 16, 2025).[28]

---

[27] Session alleged "it was well known that Lt. Breckenridge, a white employee, harassed employees . . . and engaged in discriminatory conduct," Doc. 85 at 14, and largely relied on audit interviews: (a) Lizette Batchelder, Doc. 83-35, regarding harassment of women and sexual comments from Breckenridge; (b) Arabella Blanks, Doc. 83-36, describing sexist comments from Breckenridge; (c) Sarah Carrol, Doc. 83-39, stating Breckenridge poked her and talked down to her; (d) Ricardo Martin, Doc. 83-41, corroborating inappropriate jokes and remarks from Breckenridge and that he pokes people; and (e) Kimberly Pitti, Doc. 83-42, confirms inappropriate remark by Breckenridge. It also includes deposition testimony from Wells, Doc. 80-80 at 66–67, confirming Breckenridge was investigated for sexual harassment; and deposition testimony from Thomas Swart, about the jail audit and investigation of Breckenridge. Doc. 80-84 at 56–57, 85–86.

[28] The Court does not rely on unpublished opinions as binding precedent,

Summary judgment is due to be granted on the race discrimination claims under Title VII, FCRA, and § 1981. Summary judgment is also proper as to Session's § 1981 claim because without reference to § 1983 it fails to state a claim. <u>Jimenez</u>, 146 F.4th at 1000–02 (noting failure to cite the correct statute is not mere scrivener's error).

## C. <u>FMLA Interference Claim</u>

FMLA provides eligible employees 12 weeks of job-protected leave for qualifying reasons. 29 U.S.C. § 2612(a)(1). A FMLA interference claim requires proof an employee was denied a benefit to which they were entitled. <u>Hurlbert v. St. Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1293 (11th Cir. 2006). Because Session's FMLA request was approved, there was no evidence he was denied a benefit to which he was entitled.

Accordingly, summary judgement is due to be granted as to the FMLA interference claim.

## D. <u>FMLA Retaliation Claim</u>

Without direct evidence, courts use the <u>McDonnell Douglas</u> framework. <u>Lapham v. Walgreen Co.</u>, 88 F.4th 879, 889 (11th Cir. 2023). A prima facie case requires showing (1) the employee engaged in statutorily protected conduct; (2)

_____

however, they may be cited when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060-61 (11th Cir. 2022).

suffered an adverse employment action; and (3) a causal connection between the two. Id. For the FMLA retaliation claim, Session argued the close temporal proximity is sufficient to show a causal connection between his protected activity and the adverse employment action. Jones v. Gulf Coast Health Care of Del., 854 F.3d 1261, 1271-72 (11th Cir. 2017).

Session notified the Sheriff he would need FMLA on October 7, 2021, and Session was notified of the investigation on October 15, 2021. Session submitted his FMLA request on or after October 20, 2021 (when his doctor signed it); and it was approved on October 25, 2021, for leave to start October 28, 2021. The investigation report was completed October 27, 2021, and the disciplinary recommendation of termination was done the same day. Doc. 80-7, Doc. 80-39. The Sheriff approved dismissal on October 28, 2021, and Session was terminated the same day. Doc. 75-1 at 272. The termination was changed to administrative leave pending the name clearing hearing. Session was terminated again on November 16, 2021. Using either termination date, there is close temporal proximity to Session's protected activity of requesting FMLA leave.

However, the Sheriff argued close temporal proximity is not enough to show causation when an adverse employment action is already contemplated before the protected activity occurs. Doc. 76 at 24 at 22-23. Here, the investigation process started with Breckenridge's request on September 14,

2021, when Session was already on probation and before he provided notice of needing FMLA. The investigation proceeded for all three officers, and sustained violations for all three. There is no evidence Zagar knew of the FMLA request, so no evidence that his decision to sustain violations was impacted by Session's FMLA notice.

For Session, the discipline recommendation was always termination. There is evidence Wells knew of the FMLA request, but no evidence the Sheriff was aware of the FMLA request. Both Wells and the Sheriff concurred in termination. There is no evidence Session's notice about FMLA impacted the investigation process or outcome.[29] Because Session was already on probation, termination was the consequence of a process that started before the FMLA request and is therefore not causally connected. Cf. Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268272 (2001) (employers are not required to change previously planned actions because protected activity occurs).

Accordingly, summary judgment is due to be granted on the FMLA retaliation claim.

---

[29] In contrast, summary judgment was denied as to Haynes' claim for FMLA retaliation because on the same day Haynes requested FMLA, the Sheriff terminated Haynes, even though termination had not been previously recommended.

E. <u>Disability Discrimination and Retaliation (ADA)</u>

To establish discrimination under the ADA, a plaintiff must show: (1) he was disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability. <u>Holly v. Clairson Indus., L.L.C.</u>, 492 F.3d 1247, 1255–56 (citation omitted). The ADA has three definitions of a disability: (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such impairment, or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1). If a prima facie case is established, the burden-shifting analysis of Title VII applies. <u>Holly</u>, 492 F.3d at 1255–56.

A FMLA notice or leave request is not the same as notice of a disability. The failure to accommodate claim fails because there is no evidence of a request for accommodation. <u>See</u> <u>D'Onofrio v. Costco Wholesale Corp.</u>, 964 F.3d 1014, 1022 (11th Cir. 2020) (citing <u>Gaston v. Bellingrath Gardens & Homes, Inc.</u>, 167 F.3d 1361, 1364 (11th Cir. 1999)). For similar reasons, the ADA retaliation claim fails. Session has not shown he engaged in protected activity related to his alleged disability.

Accordingly, it is hereby

**ORDERED:**

1. Defendant's Dispositive Motion for Summary Judgment (Doc. 46) is **GRANTED**;

32

2. Defendant's Rule 56 Motion to Exclude Certain Evidence (Doc. 93) is **DENIED** as moot;

3. The Clerk is directed to enter judgment in favor of H.D. "Gator" DeLoach, in his official capacity as Sheriff, Putnam County, Florida, and against Gregory Session and close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 30th day of December, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

ddw
Copies:

Counsel of record

33